IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

NORTHERN DIVISION


In re:                      )
                            )
UNITED STATES OF            )
AMERICA,                    )
                            )
        Plaintiff,          )
                            )
vs.                         )
                            )
WILLIAM CLYDE ALLEN,        )   Case No.
III,                        )   1:18-CR-00086
                            )
        Defendant.          )
                            )
_____      )




BEFORE THE HONORABLE DUSTIN PEAD

October 15, 2018


Detention Hearing

**Appearances of Counsel:**

For the Plaintiff:    Mark K. Vincent
                          Attorney at Law
                          U.S. Attorney's Office
                          111 South Main Street
                          Suite 1800
                          Salt Lake City, Utah 84111

For the Defendant:    Lynn C. Donaldson
                          Attorney at Law
                          Utah Federal Defender Office
                          43 East 400 South
                          Suite 110
                          Salt Lake City, Utah 84111

Court Reporter:

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

1

2                        **(11:07 a.m.)**

3              THE COURT:  Good morning everybody.  Thank

4    you for your patience.  Welcome to you, Mr. Allen.

00:20:14    5    We're here on a detention hearing.  Today's date is

6    October 15th, of course, and your attorney is to your

7    left, Mr. Donaldson.

8              Representatives from the United States are to

9    your collective left as well.  To all of you welcome.

00:20:27   10    And I have had a chance -- also welcome to your

11    family members and friends and other interested

12    parties here.  Mr. Allen, I'm grateful for their

13    appearance too.

14              I have had a chance to review the Pretrial

00:20:39   15    Service Report and speak with our officer assigned on

16    drafting the report.

17              Mr. Vincent, have you had adequate

18    opportunity to review it?

19              MR. VINCENT:  We have, Your Honor.

00:20:48   20              THE COURT:  Mr. Donaldson, have you as well?

21              MR. DONALDSON:  Yes, Your Honor.

22              THE COURT:  Gentlemen, I'm hoping you can let

23    me know where we stand today.  Mr. Donaldson, I'm

24    happy to go through if it is a contested detention

00:21:00   25    hearing or if there are some alternatives we're

considering short of a contested hearing. What's your view?

MR. DONALDSON: I think we could just handle it sort of in the normal course.

THE COURT: Great. Mr. Vincent, let's start with you.

MR. VINCENT: The court has had the privilege of seeing the Pretrial Services Report and I think it is very thorough. The only disagreement we have, and I have spoke with Mr. McBride about this, is that on the presumption of detention he indicated in the report that the presumption does not apply.

We looked at the statute and we believe that it clearly does as under 3142(e)(3)(C) it involves an offense under 2332b(g)(5)(B) which is a biological weapon. In the 175 charge is listed in there and it doesn't say 175(a) but it says 175 or 175b biological weapon. And as such, we would -- we would be of the position that it is presumed that he should be detained.

THE COURT: Thank you.

MR. VINCENT: Having said that, I know that the court has had an opportunity to see his mental -- the reports of his mental health history, of his prior incarcerations and his compliance, and the

4

```
 1    evaluation or the opinion of the Pretrial Services

 2    Officer that detention should be applied and we would

 3    submit it on that.

 4              THE COURT:  Thank you.  Mr. Donaldson, let's

 5    hear from you.

 6              MR. DONALDSON:  Well, of course I agree with

 7    the report.  I don't think it is a presumption case

 8    so I'll address it that way first if I could.  In

 9    terms of flight, Mr. Allen has -- well I'll combine

10    -- I don't know if you have a problem with this, I am

11    going to combine both the proffers in the argument.

12              THE COURT:  Sure, I'm perfectly fine with

13    that.

14              MR. DONALDSON:  All right.  Of course it has

15    been confirmed through his wife, his father, and his

16    mother that he has lived in Utah, excuse me, for all

17    but about four years of his life when he was in the

18    military.  And he has lived at the address in Logan

19    there for at least two years.

20              Everybody who is significant to Mr. Allen

21    lives in the State of Utah.  They're here in the

22    courtroom including his sister Amber Rainford.  His

23    wife effectively is his life.  He is the principal

24    caretaker for her.  He gets up and makes her

25    breakfast in the morning and she has confirmed all
```

00:22:37 (line 5)
00:22:53 (line 10)
00:23:02 (line 15)
00:23:20 (line 20)
00:23:42 (line 25)

```
 1   this, by the way.  He does the wash in the home

 2   because the washing machines apparently are down some

 3   stairs.  He maintains the household.  He shovels the

 4   snow.  He cuts the lawn.  He keeps the yard in order.

 5   He basically just cares for her all of the time.

 6         I noticed in his criminal history there was

 7   no reference to a prior failure to appear, but I

 8   think that cuts his way in terms of his willingness

 9   to show up together with conditions that the court

10   could set.  In terms of danger, um, I think there are

11   things that the court could do to manage any concerns

12   of danger and I'm just going to lay some of those

13   out.

14         You could restrict internet access for him.

15   I have spoken again to his wife and she's confirmed

16   that she will either have their internet service

17   ended or she could just password protect any device

18   that she has or that are in the home that have

19   internet access.

20         The court could also limit his mailing

21   privileges to restrict private letters to government

22   leaders allowing him, of course, to file his taxes

23   and to do things like that that anybody would have to

24   do.  And if there is any question about that, you

25   could have him check with the Pretrial Officer.  I
```

```
 1    would also recommend that electronic monitoring is a

 2    possibility and that you could restrict his movements

 3    that way and at least track them.  In terms of

 4    concerns about past, and we're talking most recently

 5    at most 18 months ago, any kind of drug or alcohol

 6    treatment concerns we can have him subject to random

 7    monitoring and testing.

 8          Having spoken again to his wife, she said she

 9    would do virtually anything within her ability to

10    make sure that he complies with the court's order and

11    I'm sure that that would include him appearing in a

12    testing site.

13          Lastly, there could be just a very initial

14    mental health screening that could be done just with

15    the requirement that there be treatment if it seems

16    appropriate and attendance at treatment.  So I

17    believe all of those conditions make this an offense

18    or charged offenses and a person who is subject to

19    manageable, you know, conditions of release.  So I

20    would -- I believe that the court should release him.

21          THE COURT:  Thank you, Mr. Donaldson.

22          Mr. Vincent, can you walk me back through the

23    presumption argument.  Let's go back to the statute.

24          MR. VINCENT:  Yes, Your Honor.  So on the

25    Pretrial Services Report on page seven it indicates
```

```
00:27:02    1    that the charge doesn't appear to be listed under 18

            2    USC 3142(e)(3).  If you go to 3142(e)(3), it talks

            3    about Section 3 talks about that it is a -- it is a

            4    presumption should be detained.  And then if you go

            5    down to Section C.

            6             THE COURT:  Sub paragraph C?

            7             MR. VINCENT:  Yes.  It says, an offense

            8    listed in Section 2332b(g)(5) paren capital B, and

            9    then it says for which a term of imprisonment is more

00:27:22   10    than 10 years as prescribed.

           11             Well, if you go to that section it lists

           12    certain terrorist crimes that are listed under (B)

           13    small (i) and on the code that's Page 8704.  As you

           14    go down there it talks about 175 or 175b relating to

00:27:49   15    biological weapons.  Well the charge in the complaint

           16    listed 175(a) and the maximum penalty is life

           17    imprisonment at this juncture.  So --

           18             THE COURT:  Thank you.

           19             MR. VINCENT:  -- we would argue that that

00:28:04   20    presumption does apply.

           21             THE COURT:  Is there anything else you would

           22    like to address from Mr. Donaldson's arguments.

           23             MR. VINCENT:  Well, our concern on the flight

           24    isn't -- we will concede that he has lived here most

00:28:17   25    of his life and his family is very supportive.  Our
```

```
 1   concern is that he doesn't tend to acknowledge that

 2   there may be some mental health issues.  And to put

 3   that burden on his wife seems extraordinary

 4   especially given the light of the arguments or of the

 5   conduct that he is charged with committing.

 6        And as such, we would think that and he is

 7   looking at considerable penalties and that doesn't

 8   play into it.  Before he is aware of it but

 9   definitely now there would be an incentive to leave

10   so that he doesn't have to face the piper.

11        Again, with the dangerousness, I think that

12   the charges themselves speak loudly enough to address

13   that danger.

14        THE COURT:  Thank you, Mr. Vincent.  Let's

15   start with the presumption.  I'm sorry.  Of course,

16   Mr. Donaldson.

17        MR. DONALDSON:  Oh, no.  Um, to the extent

18   that the court believes that the presumption does

19   apply, and I appreciate Mr. Vincent's analysis, um, I

20   still think in this situation given his -- just all

21   of his ties are here and he does have family support,

22   and frankly what I think happens sometimes when

23   someone like Mr. Allen -- when problems seem to

24   evidence themselves there is -- there is increased

25   efforts by family members to make sure that he is
```

00:28:39

00:28:59

00:29:13

00:29:27

00:29:54

```
1    compliant and that he does what he is supposed to do.

2         Just addressing more directly the

3    government's argument about flight, this man really

4    has no resources.  To the extent that there looks

5    like there is positive cash flow there in the family,

6    I think that's pretty much controlled by his wife.

7    And she's not going to give him money to run any

8    place.

9         THE COURT:  I don't think flight is honestly

10   an issue here.

11        MR. DONALDSON:  Okay.  In terms of concerns

12   about sort of mental health, it is true that

13   sometimes people have conditions that are resistive

14   to treatment.  But having met with Mr. Allen on I

15   think five occasions now, I believe he will follow

16   what the court tells him to do or he will tell you he

17   won't do it.  So I think we can address that through

18   the resources that are available through pretrial

19   and EM.  So that's all.

20        THE COURT:  Thank you.

21        MR. DONALDSON:  You bet.

22        THE COURT:  I appreciate your thoughtfulness.

23   And Mr. Allen, Mr. Donaldson is an excellent attorney

24   and he is trying to address some complicated issues.

25   I see you have a lot of people here in support.
```

There are a couple of things that we need to grapple

with.  The first one is presumption of detention.

There is a category of offenses for which it's

presumed someone should be detained.  It's a

rebuttable presumption, to use terms that we use here

in court.  The government has to persuade me,

notwithstanding rebuttable presumption, that you

should be detained.  You have a burden in a

presumption case but it's a burden of production.

        The first issue we have to address is whether

the statute, based on what you're charged with,

triggers the presumption.  Mr. Vincent has cited

18 USC 3143(e)(3) subparagraph (C).  It references

another part of the United States code.  It is 18 USC

2332 small b paren (G) paren (5) paren large (B).

        When I go there, it references another part

of the Code.  So our goose chase takes us down to

18 USC 175 or 175b.  So when I take a look at

18 USC 175, and 175b, 175b doesn't apply, you're not

charged with that offense.  The question is whether

175 triggers it.  And if you take a look there is

actually two 175s.  One is 175 in isolation and the

next one is 175a, no paren.  If you take a look at

175a, that doesn't seem to have a criminal component.

What it does is it authorizes the attorney general to

request the Secretary of the Defense to assist in an

enforcement of an emergency situation involving a

biological weapon of mass destruction.

That section or that statute is not cited

under 2332 small b but 175 is.  So if you take a look

at 175, there are three subparagraphs A, B and C.

This is Page 500 roughly, Mr. Donaldson.

MR. DONALDSON:  Thank you.

THE COURT:  You're charged, of course, under

175 small paren (a).  Looking at the plain language

it does appear to me, Mr. Allen, that the presumption

is triggered.  It is true that 2332b does not

reference 175(a) in particular.  I think a fair

reading or reasonable reading is that it is intended

to capture 175 in its entirety.  That includes

subsection (a).

I recognize that this is a little bit of a

nuanced argument.  Frankly we could probably examine

it a little bit closer if need be, but I think it is

adequately reasonable or reasonable enough to

conclude that the presumption is triggered.  But let

me address this both at the presumption is triggered

and if it is not.  If the presumption is triggered,

then, of course, you have the burden of production as

I've mentioned here.  Earlier the government has the

```
 1   burden of persuasion.

 2          Mr. Allen when I look at you and I look at

 3   your family members and friends that are here, this

 4   case strikes me as a case of unique contrast to be

 5   frank with you.  You served honorably in the United

 6   States Military, Navy if I understand correctly, from

 7   1998 to 2002 which the report identifies.  There is

 8   some information about your service in the Navy that

 9   is corroborated and some that isn't, but there is

10   honorable service.  I think you should be commended

11   for what you have done with the Navy.

12          I'm also impressed by your love and

13   assistance to your wife, who I note is in the

14   courtroom and disabled and that she needs you.  I

15   remember our last hearing here on October 5th you

16   expressed your concerns for her physical wellbeing.

17   And I think that says a lot about the type of person

18   that you are.  I think that shows your

19   thoughtfulness, your concern for others.

20          You have also been, I think if we read the

21   complaint, noncombative.  In fact, Mr. Allen, it

22   appears you have been very cooperative.  The

23   complaint indicates that you understood what was

24   being alleged against you.  You even agreed to answer

25   some questions.  You were shown photographs of
```

1  letters and notes referenced in the complaint.  You

2  appear to have admitted that you sent them and you

3  even added some additional letters that you may have

4  sent including to the Queen of England, the President

5  of Russia, and another U.S. Government Official.

6       You identified how you had collected those

7  addresses and from the internet.  You explained to

8  agents who had conducted the search warrant that you

9  researched Ricin on the internet.  You had allegedly

10 admitted to the purchase of 100 castor beans from

11 eBay.  You even provided the FBI with your log-in and

12 password for your e-mail account which connected to

13 eBay.  And, of course, subsequent review of the

14 accounts showed the purchase that you had made I

15 believe it was December of 2017.

16      So you have someone that -- your conduct here

17 doesn't reflect kind of this sinister nature of the

18 materials in the letters themselves, but we can't

19 ignore what those letters contained.  There is, in

20 other words, this is the contrast I'm talking about.

21 There is stark evidence of an absence of concern for

22 others.  For instance, chief among them is the Ricin

23 itself, of course.  The letter to the President, for

24 instance, which contained the note "Jack and the

25 Missile Being Stock Powder" contained ground castor

14

beans that yielded a positive result for Ricin.  The

Pentagon received two letters, also with pieces of

castor beans, and there was an additional letter to

the FBI, again, tested positive for Ricin.

The complaint indicates, Mr. Allen, that you

expressed at least in some way your motivation for

what had allegedly happened.  The complaint says that

you may have wanted them in case World War III broke

out.  You thought you could make them useful to bear

arms and to defend the nation.  You also stated that

you never used castor beans before.

So I have to determine under Mr. Donaldson's

argument whether this sort of conduct is anomalistic.

In other words, are there reasons to believe that

this is a recent problem or is there hints of a

larger pattern, maybe even a concerning pattern.  And

there is unfortunately some evidence at least

according to the complaint recognizing the weight

that I give a complaint, that this may be part of

perhaps a larger pattern of concern on your own part

about the government.

We have talked about the letters, the Ricin

letters that were sent most recently but there has

been some other threats.  For instance, a threat in

2015 to the CIA threatening to kill, you may have

said the President of the agency, I don't know if you

meant the president -- the director of the CIA or the

President of the United States, if they did not stop

infringing on your constitutional rights.  In 2017,

you purportedly sent an e-mail bomb threat to

Lackland Air Force Base in Texas which said, "I have

a bomb to kill your people."  I believe you admitted,

according to the complaint, that you had sent that

e-mail.

Most recently, about a week before the Ricin

letters, an e-mail to the Utah Department of Public

Safety entitled "Multiple Imminent Radiation

Attacks."  And I see many individuals who are

concerned about the government.  And concerned about

government action or inaction.  But, of course, these

were a little bit different, the most recent letters.

I know that you were interviewed regarding some of

the earlier threats but these were different because

of the positive result for Ricin.  It goes without

saying that the element of Ricin in the letters I

think poses a danger, significant danger.  Not just

for you, but, of course, for the recipients.  Ricin,

of course, as the complaint describes, can be

extracted from castor beans either through milling or

grinding or through solvents.  The complaint reflects

1   that it doesn't require a lot of technical ability

2   perhaps, but the process is, as you might expect,

3   very dangerous.  Of course, it's dangerous to anyone

4   who is exposed to it.  Serious risks exist upon

5   ingestion, inhaling, or injection including potential

6   death within a short period of time.  And as you may

7   be aware, there is no known antidotes for Ricin.

8           So it strikes me that what happened most

9   recently or allegedly has happened most recently is

10  part of perhaps a larger concern, a larger problem of

11  threats to the government.  And it's not of just an

12  ongoing nature, I would suggest, and I think that the

13  evidence does support a conclusion of an escalating

14  nature.  So the inclusion of the Ricin in the

15  letters, at least the ones that were retrieved, I

16  think causes me some significant alarm.

17          When I read the Pretrial Service Report,

18  Mr. Allen, I see some things that have happened to

19  you over the years that cause me some concern.  And

20  I'm trying to determine all of this in the context of

21  whether you pose a danger to yourself or to the

22  community.  I noted, for instance, in the report,

23  that in your term in the Navy, you were physically

24  assaulted, seriously assaulted, by some servicemen

25  which resulted in a head injury.  I also note as we

```
 1  have referenced, at least generally here today, a

 2  confluence of other challenges like substance use.

 3  There may even be ongoing later emotional or mental

 4  health concerns that have manifested themselves only

 5  lately.  It would not surprise me if there are a

 6  number of factors that maybe have contributed to the

 7  point to where we're at today.  Mr. Donaldson sort of

 8  referenced this when we talked about a mental health

 9  evaluation.  I'm without a lot of information about

10  what we can attribute to certain alleged conduct and

11  how we balance that versus danger and flight.

12          I'm prepared to conclude that you have more

13  than met your burden of production on flight risk.  I

14  do not believe you pose a significant risk of flight

15  or even an unmanageable risk of flight, frankly.

16  Everything you love, everything you cherish is within

17  the state.  I don't believe that you would flee, but

18  I do conclude that you pose a danger to the

19  community, danger to yourself, danger to others.

20          I'm also concerned about some of the alleged

21  incidents of self-harm in the past.  And I'm worried

22  frankly, Mr. Allen, with what has happened here that

23  the allegations reflect at a minimum a recklessness,

24  an absence of regard for your own safety let alone

25  the safety of others.
```

When you add that to the earlier threats, I
believe they have, as I mentioned earlier, escalated,
gotten more serious.  I do think I would benefit from
a full mental health evaluation but I cannot and
conclude that I should not order your release at this
time.  So I conclude you are a danger to the
community.

Mr. Donaldson you had referenced a mental
health treatment.  Is there anything that you would
like to --

THE DEFENDANT:  If I can say something?

THE COURT:  I want you to ask Mr. Donaldson
first if that is okay.  All right?

THE DEFENDANT:  I'll follow the spirit if it
is okay, sir.

THE COURT:  Mr. Donaldson?

THE DEFENDANT:  I can --

THE COURT:  Why don't I let --

THE DEFENDANT:  I don't have -- I'm not a
secretive kind of guy but I had told the FBI when I
mailed the beans that they were whole.  They weren't
crushed or processed in any.  If you have all of the
letters you can see that that is true.

MR. DONALDSON:  Thanks.  Let me just say this
and --

THE DEFENDANT:  It is not illegal to mail

them I got them from eBay.  So --

                    THE COURT:  I understand.

                    THE DEFENDANT:  It wasn't a processed thing.

00:44:05            THE COURT:  And I think Mr. Donaldson's

concern is a legitimate one here.  I don't want you

to make any statements that could further incriminate

you any more.

                    THE DEFENDANT:  Okay.

00:44:13            THE COURT:  I think the concern, maybe I

should have said it a little bit better, Mr. Allen,

it is not just the presence of the beans, it is in

conjunction with the appearance of threat.

                    THE DEFENDANT:  Right.

00:44:24            THE COURT:  And so that's -- it's not the

possession of them alone, it's the combination of the

threat that causes me concern.

                    THE DEFENDANT:  It's the radiation attacks

from the federal government.

00:44:39            MR. DONALDSON:  Bill --

                    THE COURT:  Sure.  So here is what I would

like to do.

                    THE DEFENDANT:  Bill Clinton did a report on

it.

00:44:43            THE COURT:  And I do want you to share this

information with Mr. Donaldson so he can evaluate it

and use this as part of your case.  But I do want to

caution you about making statements in this setting.

I don't think it would be helpful to you any further,

okay.

THE DEFENDANT:  Yes, sir.

MR. DONALDSON:  I just -- are you done?

THE COURT:  No, go ahead.

MR. DONALDSON:  I don't want to cut you off.

THE COURT:  No.

MR. DONALDSON:  Should, as the case goes

forward, should the allegations about the condition

of the castor beans being Ricin and ground up, or

should there be other innocent explanations where

they would not have been in that condition, I

certainly feel that that would be a grounds to reopen

in front of you since you have premised so much on

those allegations.  Is that fair?

THE COURT:  I think that's fair.  And

Mr. Vincent, I noted a preliminary field testing

positive result and then subsequent confirmation not

just of the letter to the President but also the two

to the Pentagon and one to the FBI.  But maybe I am

mistaken.

MR. VINCENT:  That's correct.

```
 1              THE COURT:  Okay.

 2              MR. VINCENT:  Since then, the CIA received a

 3        letter but didn't confirm positive on the Ricin.  And

 4        the Secretary of the Air Force received a letter just

 5        last Friday and it did confirm positive.

 6              THE COURT:  All with the return address from

 7        Mr. Allen?

 8              MR. VINCENT:  Some of them had the return

 9        address, some didn't, but obviously the same

10        handwriting.

11              THE COURT:  So the only one that didn't have

12        the positive result on Ricin was the most recent one

13        that he had referenced in his interview?

14              MR. VINCENT:  Well, I don't want to misspeak.

15              THE COURT:  Okay.

16              MR. VINCENT:  It was the CIA one that -- that

17        didn't come back positive on the Ricin.

18              THE COURT:  But you're right, Mr. Donaldson,

19        I'm examining the detention through the lens with

20        which we have discussed here today.  So if further

21        evidence demonstrates that the foundation of my

22        conclusions here is suspect, I would be happy to

23        revisit it definitely.

24              MR. DONALDSON:  Thank you, Your Honor.

25              THE COURT:  Mr. Vincent, anything else?
```

1          MR. VINCENT:  No, Your Honor.

2          THE COURT:  Mr. Allen, the next hearing, of

3    course, is going to be the initial appearance, if an

4    indictment is returned, an indictment is being

00:46:56   5    pursued this Wednesday; is that correct?

6          MR. VINCENT:  It is presently in Washington

7    and they sort of run the reigns on that matter.

8          THE COURT:  Don't we have an initial

9    appearance set though for this Thursday?

00:47:10   10         MR. VINCENT:  Thursday at 11.

11         THE COURT:  So that will be the next hearing

12   and we'll go from there.  Thank you to all of you

13   family members and friends for being here.  I

14   appreciate your presence.  I'm sure Mr. Allen does as

00:47:21   15   well.  The hearing is concluded.

16              (Whereupon, court adjourned at 11:34 a.m.)

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 26th day of September, 2019.


_____

Laura W. Robinson

RPR, FCRR, CSR, CP